(No. 14799.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ISADORE COHEN, Plaintiff in Error.

*Opinion filed December 19, 1922.*

1. CRIMINAL LAW—*harmless error in rulings on evidence will not reverse.* It is not proper in a prosecution for assault to present to the defendant photographs of himself and his wife and ask how a certain person with whom the defendant has testified he was not acquainted got possession of them, but where the question of such acquaintance is only a collateral matter, the error in admitting the question and the defendant's answer that he did not know is harmless and not ground for reversal.

2. SAME—*person who shoots at one and wounds another may be prosecuted for assault with intent to kill the latter.* Where a person deliberately shoots at one person and in the direction of another, who is wounded by the shot, an intention to kill the latter is established although no actual malice or ill-feeling toward him is shown, and a conviction may be had of an assault upon the wounded person with intent to kill and murder him, as the malice requisite to murder is presumed where the proof is that the act was committed deliberately and was likely to be attended with dangerous consequences.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JACOB H. HOPKINS, Judge, presiding.

WILLIAM NAVIGATO, (THOMAS E. SWANSON, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered·the opinion of the court:

Isadore Cohen was tried in the criminal court of Cook county upon an indictment charging him with assault with intent to kill and murder Joseph Kleiman. There was a verdict of guilty, on which judgment was entered sentencing him to the penitentiary, and the record has been brought to this court as a return to a writ of error.

On January 29, 1921, Nathan Salintzky kept a restaurant at 831 Maxwell street, in Chicago. In the evening of that day he met the defendant, Isadore Cohen, and wife, at Fourteenth and Morgan streets, and an altercation of some kind arose between him and the defendant, of which the defendant and Salintzky gave different accounts at the trial. In the fight Salintzky was not injured but the defendant received a scalp wound. He went to a drug store, where the wound was treated with iodine and his head bandaged. Afterward Salintzky went to his restaurant and then to the restaurant of Joseph Kleiman, at 900 Maxwell street, where there was a drinking place in the front and a restaurant in the back, with a kitchen between. About a half or three-quarters of an hour after the trouble in the street Salintzky was standing in front of the bar with Charles Sher, who had the drinking place, when Mrs. Cohen came in with a revolver and fired three shots at Salintzky. She did not hit him but two shots took effect in Louis Kass, better known as "Shorty." Two shots were fired from the revolver afterward, and the evidence for the People was that the defend-

ant fired those shots, one of which struck Kleiman in the foot. The defense was that the defendant was not in the saloon at the time of the shooting but that it was all done by Mrs. Cohen, and to determine that question understandingly it seems necessary to recite the evidence.

Charles Sher, who ran the drinking place, testified that he was standing in front of the bar with Salintzky when the defendant and his wife came in, and the defendant said, "Hello! Salintzky! Who is going to stand all these bills?" or, "Who is going to pay the doctor's bill?" and Salintzky said, "We will see about that;" that the witness pulled them apart and said, "Now, don't fight around here; fight outside," and Mrs. Cohen then started to fire shots from the revolver; that Shorty fell down, and the witness was afraid and crawled behind the bar, and that he did not see who fired the two shots afterward, when Kleiman was wounded.

Nathan Salintzky testified that the defendant and wife came in the restaurant and the defendant asked who was going to pay him his doctor bills; that the witness said not to make any disturbance, and Sher said that if they wanted to fight, to go outside; that the defendant then said, "Let him have it, Lena," and she commenced shooting; that she shot three times from behind her husband, over his shoulder; that the witness ducked, and defendant grabbed the gun and shot twice at the witness, but there were so many running around that he shot Kleiman.

Louis Kass, known as "Shorty," testified that he was talking to his foreman when the defendant and wife came in; that Mrs. Cohen stood there with the gun and everyone hid; that she started to fire, and the witness fell to the counter with one shot and got another shot in the leg; that the witness was on the floor, and Salintzky got down on the floor and hid behind him and had hold of his legs; that defendant grabbed the pistol and started to shoot; that he fired twice, but the witness was on the floor and did not see who was shot.

Sarah Kleiman, wife of Joseph Kleiman, testified she was waiting on table in the restaurant about eight o'clock when Salintzky came in and stood at the bar talking with Sher; that about half an hour later the defendant and his wife came into the place and started talking to Sher; that Sher told the defendant and wife to kindly step out of the saloon,—that he did not want any fight in his place of business; that the defendant said to his wife to shoot Salintzky, and Mrs. Cohen shot at Salintzky three times; that the first shot went against the bar, the second struck Shorty and the third went against the door; that the defendant took the gun away from Mrs. Cohen and shot Kleiman, and the defendant and wife ran out.

Meyer Kleiman, brother of Joseph Kleiman, testified that he was in the restaurant and heard two shots; that he looked back and saw the defendant there with the gun in his hand; that Joseph Kleiman started hollering that he was shot, and the witness looked at his foot and it was bleeding.

Joseph Kleiman testified that about eight o'clock he was in the back part of the restaurant, sitting with his brother; that he heard three shots fired and heard his wife scream, and he went through the kitchen and saw the defendant with the gun in his hand; that the defendant fired two shots and the witness was struck below the knee; that he saw the defendant shoot him, and that he was taken to the west side hospital.

Attention is called to the fact that some witnesses did not see the later shots from the revolver. One of them, Dave Stepinsky, said that as soon as Mrs. Cohen fired a couple of shots he hid behind the bar, trying to save his own life, and did not see the later shots; and Max Sher, a brother of Charles, saw the first three shots fired by Mrs. Cohen but did not see the other two shots, because he hid behind the bar. This, with testimony of the defendant that he was not in the restaurant at the time of the shooting but that when he left the drug store he went to the restaurant

and got his wife and pulled her out, and that he did not have a gun or anything to do with the shooting, constituted the defense. The jury did not give any credit to the testimony of the defendant, and the fact that some of the witnesses only saw the shooting by Mrs. Cohen, because they were hiding behind the bar or elsewhere for their own safety, does not militate against the conclusion of the jury, which was manifestly right.

After the trouble at Fourteenth and Morgan streets the defendant followed Salintzky to a restaurant with his wife, armed with a revolver, and that trouble did not excuse or justify the assault. The defendant gave this account of that trouble: He said that three men stepped out of the alley and told him to stick up his hands, and when he resisted Salintzky hit him over the head with a gun and broke the handle right off at the butt. This is the revolver which it was claimed Mrs. Cohen had, which must be considered doubtful if the handle was broken off. Salintzky gave this account of the trouble: He said he had had trouble with the defendant at his restaurant for disturbing his customers and ordered him to keep out; that he met the defendant and wife that evening and the defendant went for his back pocket and pulled out a gun; that he jerked the gun out of defendant's hand and Mrs. Cohen took the gun away and threw it in the street, and that he pushed the defendant up against the door-knob of a store and his head was cut.

It is urged that the court erred in admitting testimony prejudicial to the defendant. The defendant testified that he did not know Salintzky but had seen him around the neighborhood, and on cross-examination the State's attorney presented to the defendant photographs of himself and wife taken in Australia and asked him if he knew how Salintzky got these things in his possession. An objection was made and overruled. The question of any acquaintance between the defendant and Salintzky was collateral and of very little importance. The question was improper

and the ruling wrong. The mother of Salintzky was asked if she knew whether her son knew the defendant, and the court sustained an objection to the question. The defendant answered the question whether he knew how Salintzky got the photographs by saying that he did not. Nothing further was done about the matter and there was no evidence concerning it. It is clear that the erroneous ruling could not possibly have affected the result as it did not affect the substantial merits of the case and therefore is not ground for reversal. *Ritzman* v. *People,* 110 Ill. 362; *Johnson* v. *People,* 202 id. 53.

The court gave at the instance of the People an instruction authorizing a verdict of guilty if the jury found from the evidence, beyond a reasonable doubt, that the defendant with malice aforethought, either expressed or implied, made an assault with a deadly weapon upon Nathan Salintzky with intent to kill and murder, even though it should appear that there was no intention to shoot Joseph Kleiman. One objection is that the language, "expressed or implied," was not defined to the jury but left them free to speculate as to its meaning. The meaning of the language was explained in two other instructions. The substantial objection is that proof of an assault upon Salintzky with intent to kill and murder him would not authorize a verdict based on the shooting of Kleiman, and on that question there has been a serious conflict in the decisions. To constitute the crime of an assault with intent to kill and murder, the specific intent to kill must be alleged and proved, and the question has been whether the conviction may rest upon proof of an intent against one while the person assaulted is a different person from the one whose life the assailant intended to take. (13 R. C. L. 802.) This court is aligned on the side of the courts holding that although the defendant inflicted the injury on a third person he may be found guilty of an assault with intent to kill and murder that person, or, otherwise stated, if the defendant intended

to kill one person and inflicted an injury upon another not intended he is guilty of assault with intent to murder the injured one. That question was considered in *Dunaway* v. *People,* 110 Ill. 333. Dunaway was charged with an assault with intent to murder Hartwell Hendrickson. The facts were that Dow Hartwell, who had commenced proceedings, as attorney for the defendant's wife, for divorce, was standing or sitting with other persons around a stove in a store. Dunaway drew a revolver and shot towards Hartwell, the ball taking effect on Hendrickson, inflicting a serious wound. Dunaway fired a second shot but did not hurt anyone. It was contended that there could not be a conviction because the intent was to murder Hartwell, but the court said the reasoning on that branch of the case was too subtle to be adopted with safety; that there were cases holding the doctrine contended for, and so many of the early text writers wrote, but the better and more modern doctrine was against the position taken. The court said if the shot fired by Dunaway had killed Hendrickson it would have been murder, and the proposition that the severe wounding by the same shot would not have been an attempt to commit murder found no sanction either in reason or the analogies of the law. The rule there declared has not been departed from, and it established the law of this State that where a person deliberately shoots at A and in the direction of B, and the ball misses A and strikes B, inflicting a wound, these facts will show the intention of the person shooting to kill and murder B although he has no actual malice or ill-feeling toward B, and he may be convicted of an assault upon B with intent to kill and murder him, and proof being made that the act was committed deliberately and likely to be attended with dangerous consequences, the malice requisite to murder would be presumed.

The judgment is affirmed.        *Judgment affirmed.*